Blake Klinkner, Utah Bar #14228
CROWLEY FLECK, PLLP
237 Storey Boulevard, Suite 110
Cheyenne, WY 82009-1931
Telephone: (307) 426-4100
Facsimile: (307) 426-4099
*bklinkner@crowleyfleck.com*

Jeff Oven *(admitted pro hac vice)*
Chris Stoneback *(admitted pro hac vice)*
Pam Garman *(admitted pro hac vice)*
CROWLEY FLECK, PLLP
490 North 31st Street, Suite 500
PO Box 2529
Billings, MT 59103-2529
Telephone: (406)252-3441
Facsimile: (406) 252-5292
*joven@crowleyfleck.com*
*cstoneback@crowleyfleck.com*
*pgarman@crowleyfleck.com*

Neil Westesen *(admitted pro hac vice)*
CROWLEY FLECK, PLLP
1915 South 19th Street
PO Box 10969
Bozeman, MT 59719-0969
Telephone: (406) 556-1430
Facsimile: (406) 556-1433
*nwestesen@crowleyfleck.com*

*Attorneys for Defendant Sunnyside Gold Corporation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| THE STATE OF UTAH, | Case No. 2:17-cv-00866-BCW |
| Plaintiff, | |
| v. | **DEFENDANT SUNNYSIDE GOLD CORPORATION'S MOTION TO DISMISS AND SUPPORTING MEMORANDUM** |
| ENVIRONMENTAL RESTORATION, LLC; HARRISON WESTERN CORPORATION; KINROSS GOLD CORPORATION; KINROSS GOLD U.S.A., INC.; SUNNYSIDE GOLD CORPORATION; and GOLD KING MINES CORPORATION, | |
| Defendants. | |

Pursuant to Fed. R. Civ. P. 12(b)(1), (2), (6), and (7), Defendant Sunnyside Gold Corporation ("SGC") moves to dismiss Utah's Complaint against SGC.

## I.    INTRODUCTION

The claims against SGC must be dismissed for the following reasons:

(A)    This Court lacks personal jurisdiction over SGC.

(B)    The State of Colorado is a required party to this lawsuit and Colorado cannot be joined as a party.

(C)    CERCLA Section 113(h) bars any interference with CERCLA response actions.

(D)    Utah's state law claims conflict with CERCLA's restoration provisions and must be dismissed based on the doctrine of conflict preemption.

(E)    Utah's state law claims are preempted by the Clean Water Act.

(F)     Utah is not entitled to punitive damages.

## II.     UTAH'S COMPLAINT

Utah's Complaint states:

On August, 5, 2015, the United States Environmental Protection Agency ("EPA") and its contractors negligently breached an entrance into the Gold King Mine, causing a blowout with approximately three million gallons of toxic waste spilling into the Animas River in southwestern Colorado ("Blowout"). The waste then flowed to the San Juan River and Lake Powell causing environmental damage to the State of Utah.

Compl. ¶ 1. The Complaint continues, "EPA concedes it is responsible for the Blowout and the resulting impacts." Compl. ¶ 2. "The intentional actions of the EPA and Contractor Defendants caused a breach in the adit, resulting in the Blowout." Compl. ¶ 55.

Despite the fact that the Complaint is based upon EPA and its contractor's alleged negligence in causing the Blowout, and despite Utah emphasizing that EPA was responsible for the Blowout, Utah fails to name EPA as a party. Instead, Utah asserts seven causes of action against various other parties, including SGC.

The Complaint alleges that SGC owns the Sunnyside Mine and closed it in 1991. Compl. ¶ 17. In 1996, SGC "signed a consent decree with the Colorado Department of [Public] Health and Environment allowing it to cease treating contaminated wastewater if it would undertake reclamation of other acid sources in the area." Compl. ¶ 17. As part of the Consent Decree, SGC "installed hydraulic bulkheads in the American Tunnel and other locations. The bulkheads blocked the drainage from the American Tunnel and reduced the discharge there, but caused acid drainage to flood the Sunnyside Mine." Compl. ¶ 18. Finally, in 2003, SGC "installed bulkheads at the Mogul Mine." Compl. ¶ 20.

In essence, Utah only complains about SGC conduct in Colorado done pursuant to specific directives of the State of Colorado and a Colorado court approved Consent Decree. A

copy of the Consent Decree is attached as **Exhibit A.**[1]  Nowhere in the Complaint is there any allegation that SGC was in any way involved in the Gold King Mine Blowout, that SGC had any part in EPA's Gold King Mine investigation plans, or that SGC played any role in the decision to open the Gold King Mine portal.

## III.   <u>ARGUMENT</u>

### A.   **This Court lacks personal jurisdiction over SGC.**

The Fourteenth Amendment's Due Process Clause limits a court's authority over a nonresident defendant unless there are "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation omitted)).

Federal constitutional law recognizes two kinds of personal jurisdiction, general or all-purpose jurisdiction, and specific or case-linked jurisdiction.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  In this case, no allegation of general jurisdiction is made because none exists.  Therefore, only specific jurisdiction is at issue. Specific jurisdiction is jurisdiction over a specific claim based on the defendant's contacts with the forum that are closely connected to the claim itself or which gave rise to the claim.  *Id.*

The Supreme Court's decision in *Walden v. Fiore* directly "addresses the 'minimum contacts' necessary to create specific jurisdiction." 134 S.Ct. at 1121.  Specific jurisdiction depends "on the relationship among the defendant, the forum, and the litigation."  *Id.*; *see also*

---

[1] The Court may consider the Consent Decree in addressing a Rule 12 motion, without converting it to one for summary judgment, because the document is incorporated by reference in the Complaint. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). In addition, the Consent Decree constitutes a document of which the Court may take judicial notice. *Id.*

*Anzures v. Flagship Restaurant Group*, 819 F.3d 1277, 1280 (10th Cir. 2016).  The essential requirement for asserting specific jurisdiction is that "the defendant's suit-related conduct must create a substantial connection with the forum State."  *Id.*  The connection has to be "based on intentional conduct by the defendant …" and "must arise out of contacts that the 'defendant himself' creates with the forum State." *Walden*, 34 S.Ct. at 1122-23 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

In order to establish specific personal jurisdiction, a plaintiff must present evidence of "three salient factors that together indicate 'purposeful direction.'" *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011).  Those factors are:  "(a) an intentional action … that was (b) expressly aimed at the forum state … with (c) knowledge that the brunt of the injury would be felt in the forum state." *Id.; see also Shipp v. Intl. Auto Group of S. Florida, Inc.*, 2016 WL 3951079, at *3 (D. Utah July 20, 2016); *Goodwin v. Am. Honda Motor Co., Inc.*, 2016 WL 6080357, at *6 (D. Utah Oct. 17, 2016) (stating that the "minimum contacts requirement is met when the plaintiff can show that (i) the defendant purposefully directed its activities at residents of the forum, and (ii) the claims arise out of or result from those actions.").

Here, SGC's only possible connection with Utah is the bare allegation that an injury has been suffered in Utah.  None of SGC's conduct took place in Utah, and there is no claim that the alleged injury was intentionally inflicted by SGC upon or expressly aimed at Utah.  Injury alone is never a sufficient connection for jurisdiction because personal jurisdiction must be based on the defendant's forum related conduct, not the plaintiff's injury.  The injury has to "'arise out of' [the] defendant's forum-related activities." *Anzures*, 819 F.3d at 1280 (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008) (internal quotation omitted)).  "The proper question is not where the plaintiff experienced a particular injury or

effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 134 S.Ct. at 1125.  The mere foreseeability of injury, moreover, will not support a finding of minimum contacts. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 296 (1980).

To sustain jurisdiction, the Tenth Circuit requires that a defendant "purposefully direct" his activities at the forum state, knowing that "'the brunt of the injury would be felt in the forum state.'" *Anzures*, 819 F.3d at 1280 (quoting *Dudnikov*, 514 F.3d at 1071-72).  In this case, there is no suggestion that SGC's activities were ever purposefully directed at Utah.  All of SGC's conduct and activities, everything it did or did not do, occurred in Colorado.  The only affirmative conduct the Complaint alleges SGC took was to sign a Consent Decree and then comply with that Decree by installing "hydraulic bulkheads in the American Tunnel and other locations."  Compl. ¶¶ 17–18.  Nothing SGC did was in or aimed at Utah.

There can be no suggestion that SGC, by lawfully bulkheading the Sunnyside Mine in accordance with its Colorado issued permits and the Colorado Court sanctioned Consent Decree, "purposely directed activities" at Utah or "invoked the benefits and protections" of Utah's laws.  Just the opposite is true.  By acting pursuant to the laws and regulatory scheme of Colorado, SGC purposely availed itself of the laws of Colorado, not Utah.  The fact that EPA's conduct at the Gold King Mine released water in Colorado that eventually made its way into Utah is irrelevant for a personal jurisdiction analysis.  *Anzures*, 819 F.3d at 1280.  Indeed, there are no allegations anywhere that SGC did anything at all in Utah, and certainly no allegations that SGC "targeted the forum state."  *Id.*  As a result, this Court does not have personal jurisdiction over SGC.

**B.  The claims against SGC should be dismissed because the State of Colorado is a required party and cannot be joined.**

In its Complaint, Utah assigns fault to SGC for installing bulkheads in Colorado.  It is undisputed, however, that the installation of the bulkheads was done pursuant to the specific regulatory directives of the State of Colorado and the court approved Consent Decree. Consequently, any adjudication of fault associated with the installation of the bulkheads must, of necessity, include the State of Colorado.

**1.  Colorado is a required party to this suit.**

Rule 19(a)(1) of the Federal Rules of Civil Procedure states that parties are "required" and must be joined in the action if either:

(A)  in that person's absence, the court cannot accord complete relief among existing parties; *or*

(B)  that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i)  as a practical matter impair or impede the person's ability to protect the interest; *or*

(ii)  leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1)(A)-(B)(emphasis added).

Colorado is a required party. Without Colorado, "the court cannot accord complete relief among existing parties." *Id.* at 19(a)(1)(A).  The *sine qua non* of Utah's Complaint against SGC is that SGC acted improperly by bulkheading the American Tunnel.  "In 1996, Sunnyside Gold signed a consent decree with the Colorado Department of Health and Environment allowing it to cease treating contaminated wastewater if it would undertake reclamation of other acid sources in the area." Compl. ¶ 17.  "Sunnyside Gold installed hydraulic bulkheads in the American

Tunnel and other locations.  The bulkheads blocked the drainage from the American Tunnel and reduced the discharge there, but caused acid drainage to flood the Sunnyside Mine."  Compl. ¶ 18.

Colorado issued discharge permits to SGC and then required bulkheading as both a permit obligation and as part of a court approved mine reclamation plan.  The Consent Decree confirms these facts:

> SGC also holds Mined Land Reclamation Permit No. M77-378 ("MLR Permit") pursuant to the Colorado Mined Land Reclamation Act, C.R.S. § 34-32-1-1 (1995) ("MLRA.")…The final reclamation plan (the "Reclamation Plan") submitted by SGC to and approved by the Colorado Mined Land Reclamation Board, includes **installation by SGC of a bulkhead at SGC's underground property line within the American Tunnel to prevent mine water from flowing directly out of the Mine workings through the American Tunnel portal to Cement Creek** and installation by SGC of a bulkhead at the Terry Tunnel portal…The [Division of Minerals and Geology] included in its rationale that indefinite or perpetual mine drainage treatment was not desirable for final reclamation and that **hydraulic seals offer the best alternative for final mine site reclamation.**  The DMG approval rationale also stated that **the physical setting of the Sunnyside Mine appeared to be ideal for a hydraulic sealing** scheme.

Consent Decree at 4-5 (emphasis added).

Colorado has a direct interest in seeing that its laws, regulations, and decrees are followed and Colorado's presence is clearly essential if the Utah requested "abatement" of injury is to occur.  Compl. ¶ 126.  Colorado is the regulatory entity with authority over SGC and over any Court ordered abatement action.  *See, e.g.*, Colo. Rev. Stat. § 34-32-101 *et seq*. (establishing a comprehensive regulatory scheme for mine reclamation); Colo. Rev. Stat. § 25-8-101 *et seq.* (establishing a comprehensive regulatory scheme for water quality issues); Colo. Rev. Stat. § 34-32-109(1)-(9) (providing that parties cannot conduct reclamation-related activities on a mine site in Colorado without a reclamation permit issued by Colorado); 2 Colo. Code Regs. § 407-1 (2016) (dictating that all activities relating to mining, reclamation, and hydrologic activities on

mine sites in Colorado must be approved through the Colorado Division of Reclamation Mining & Safety).

Colorado has expressly recognized its comprehensive regulatory oversight of SGC's conduct:

> The Water Quality Control Division (WQCD) of Colorado's Department of Public Health and Environment regulates pollutant discharges from certain abandoned or inactive mines through permits issued to mine owners and operators. **These permits regulate discharges into the State's river systems and ensure that pollutant levels in those rivers remain within regulatory limits….Regulating surface water pollution 'point sources' is the backbone of the federal Clean Water Act (CWA)**. Colorado has been delegated permitting, monitoring, and enforcement authority to implement CWA requirements within Colorado, subject to federal oversight. *See* 33 U.S.C. Section 1342(b)…. Colorado regulators approved the private owners' and operators' proposed remediation activities at the mine[]. After mining operations at the Sunnyside . . . ceased in the early 1990's, [SGC], the operator of the Sunnyside Mine, proposed to install three bulkheads in the 'American Tunnel' that drained the mines in order to manage the flow of water from the mines. Use of bulkheads is a common remediation step, and bulkheads have been installed at dozens of mines in the western United States. [SGC] eventually filed a state court declaratory judgment against the WQCD seeking judicial approval of its plan. After months of litigation, the parties settled the case and memorialized their agreement in **a 1996 judicial consent decree that required [SGC] to install the bulkheads, conduct other reclamation activities, and comply with monitoring and water treatment obligations**. In 2003, [SGC] presented evidence that it had satisfied its obligations. [SGC's] CWA discharge permit was therefore terminated in accordance with the court-ordered consent decree. (citations omitted).

Colorado's Brief in Opposition to Motion for Leave to File Complaint at 4-6, *State of New Mexico v. State of Colorado*, No. 220147 (2016) (emphasis added).[2]

Colorado is the State in charge of regulating SGC's conduct. None of the regulatory relief Utah seeks can be granted without Colorado's presence in this litigation, making Colorado a necessary party to this action. *See, e.g., Cunningham v. Municipality of Metro. Seattle,* 751 F.

---

[2] The Court can take judicial notice of pleadings filed in other cases on a Rule 12 motion. *Pace v. Swerdlow*, 519 F.3d 1067, 1072-73 (10th Cir. 2008).

Supp. 885, 896 (W.D. Wash. 1990) (providing that if a third party is attacking the actions of a defendant which were allowed or otherwise prescribed under state law, then the state is a necessary party whose joinder is required); *Davies v. Lane Cty.*, 2010 WL 1010613 at *3 (D. Or. Mar. 15, 2010) (finding that if a plaintiff seeks injunctive relief that would require a defendant to disregard the proscriptions of a state regulatory agency, then the defendant "cannot accord plaintiff complete relief in the [agency's] absence"); *Liberles v. Cook Cty.*, 709 F.2d 1122, 1134 (7th Cir. 1983) (explaining that if state regulation requires a named defendant to act in the manner complained of, then the state cannot be a "joint tortfeasor," but is instead a necessary and indispensable party).

Without Colorado in the lawsuit, SGC would be left "subject to a substantial risk of incurring . . . inconsistent obligations . . . ." Fed. R. Civ. P. 19(a)(1)(B)(ii). It is undisputed that the bulkheading at issue was done pursuant to State of Colorado directives and a Colorado State District Court issued Consent Decree. SGC could not then, and cannot now, ignore the clear directives established by that Consent Decree. Bulkheading was a key element of Colorado's reclamation plan for the area. Per the Consent Decree, the bulkheads were put in place and are still in place. To remove those bulkheads, or to implement a different water management strategy, would violate the Colorado Consent Decree and subject SGC to inconsistent legal obligations. As a result, under both Fed. R. Civ. P. 19(a)(1)(A) and (B), Colorado is a required party to this litigation.

> **2.    Colorado cannot be joined as a party, and therefore, the case must be dismissed.**

The Eleventh Amendment precludes suing nonconsenting States in federal court. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). The Eleventh Amendment and

state sovereign immunity protect not only States but "state agents and state instrumentalities."

*Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429 (1997).

With this law in mind, Federal Rule of Civil Procedure 19(b), entitled "When Joinder Is

Not Feasible," provides:

> If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
>
> > (1) the extent to which judgment rendered in the person's absence might prejudice that person or the existing parties;
> >
> > (2) the extent to which any prejudice could be lessened or avoided by:
> >
> > > (A) protective provisions in the judgment;
> > >
> > > (B) shaping the relief;
> > >
> > > (C) other measures;
> >
> > (3)  whether a judgment rendered in the person's absence would be adequate; and
> >
> > (4)  whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

In this case, "equity and good conscience" do not allow this lawsuit against SGC to go

forward without Colorado. A judgment granting the relief Utah seeks in Colorado's absence

would not be possible and any attempt at reaching a judgment without Colorado would prejudice

both Colorado and SGC.

Colorado would be prejudiced because a judgment here could ostensibly require it to take

action (if it chose to comply or if it even could comply) contrary to its own regulations, a validly

issued permit, and a judicially approved consent decree. SGC would be prejudiced because it

would be subject to inconsistent legal obligations. SGC implemented the Consent Decree and

placed the legally required bulkheads in the Sunnyside Mine as part of its Colorado administered

mine reclamation plan.  An order of this Court for abatement, as Utah demands, would undermine the Consent Decree and the regulatory authority of the State of Colorado.  *Begay v. Pub. Serv. Co. of N.M.*, 710 F.Supp.2d 1161, 1183 (D.N.M. 2010) ("Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident.").

Other than dismissal, no remedy could be tailored that would prevent the unfairness and inequity that would result from a lawsuit challenging Colorado's conduct and laws without Colorado's presence.  Without Colorado, this lawsuit against SGC cannot go forward.  *See Pueblo of Sandia v. Babbitt*, 47 F. Supp. 2d. 49, 52-57 (D.D.C 1999) (dismissing case because New Mexico had an interest in seeing its required "revenue sharing" law enforced and could not be joined); *Hood ex. Rel. Mississippi v. City of Memphis, Tenn.*, 570 F.3d 625, 632-33 (5th Cir. 2009) (dismissing suit because Tennessee had an interest in the apportionment and use of its water and could not be joined); *Center for Biological Diversity v. Pizarchik*, 858 F.Supp. 2d 1221, 1229 (D. Colo. 2012) (dismissing suit because Navajo Tribe was a required party whose sovereign immunity precluded joining them in the lawsuit).  Accordingly, Utah's claims against SGC should be dismissed.

**C.      CERCLA Section 113(h) bars any interference with CERCLA response actions.**

CERCLA strictly circumscribes attempts to challenge or interfere with the cleanup of a site once EPA has started a response action.  "Congress concluded that the need for [EPA] action was paramount, and that peripheral disputes, including those over 'what measures actually are necessary to clean up the site and remove the hazard,' may not be brought while the cleanup is in process."  *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 329 (9th Cir. 1995) (citation omitted).  "To ensure that the cleanup of contaminated sites will not be slowed or halted

by litigation, Congress enacted section 113(h) in its 1986 amendments to CERCLA." *Razore v. Tulalip Tribes*, 66 F.3d 236, 239 (9th Cir. 1995).

Section 113(h) of CERCLA expressly prohibits interference with on-going CERCLA response actions. The statute provides in relevant part:

> No Federal court shall have jurisdiction under Federal law . . . or under State law . . . to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title[.]

42 U.S.C. § 9613(h). This section is "clear and unequivocal" and "amounts to a blunt withdrawal of federal jurisdiction" for "any challenges" to an on-going CERCLA response action, including any attempt, through litigation, to interfere with, strengthen, or control the cleanup. *McClellan*, 47 F.3d at 328. Section 113(h) reflects an affirmative Congressional choice to ensure that on-going cleanup actions under EPA oversight will be shielded from lawsuits that might interfere with them. *Pakootas v. Teck Cominco Metals, Ltd.*, 646 F.3d 1214, 1220 (9th Cir. 2011) ("Congress made a choice to 'protect[ ] the execution of a CERCLA plan **during its pendency** from lawsuits that might interfere with the expeditious cleanup effort.'") (quoting *McClellan*, 47 F.3d at 329) (emphasis in original).

For purposes of the Section 113(h) bar, the CERCLA response action need not be far advanced, and, even if it is in its preliminary stages, any challenge is nonetheless barred. *See Boarhead v. Erickson*, 923 F.2d 1011, 1018, 1023 (3d Cir. 1991) (on-going preliminary remedial investigation sufficient to bar a lawsuit). Indeed, the Section 113(h) bar applies even when the government "has only begun to 'monitor, assess, and evaluate the release or threat of release of hazardous substances.'" *Cannon v. Gates*, 538 F.3d 1328, 1334 (10th Cir. 2008) (quoting *Razore*, 66 F.3d at 239).

Utah's claims, which seek Court orders requiring SGC to "abate" the alleged trespass and

nuisance, as well as its prayer for relief seeking a declaration that SGC is liable for "all costs incurred and costs that may be incurred by the State of Utah to abate the nuisance and cure the trespass," are foreclosed by federal law—as are Utah's claims under the Utah Water Quality Act and the Utah Solid and Hazardous Waste Act.  EPA has initiated response actions, and the Bonita Peak Mining District, which includes the Gold King Mine and the exterior, discharging portion of the American Tunnel, has been placed on the National Priorities List (NPL).[3]  EPA now directs and oversees CERCLA related environmental investigation and response action activities associated with the Bonita Peak Mining District, including in Utah.  *See* 81 FR 62397-01.

Utah states that "[t]he Gold King Mine and Sunnyside Mine are 'facilities' under CERCLA, 42 U.S.C. § 9601(9)" and that "the numerous downstream reaches of the San Juan River and Lake Powell, where hazardous substances from the mines have been deposited, are separate 'facilities' under CERCLA."  Compl. ¶ 67.  EPA has alleged that the NPL Site subject to its response action extends from the Upper Animas in Colorado all the way to Lake Powell in Utah.  "Because the term NPL 'site' is defined as wherever the contamination 'comes to be located,' the Bonita Peak Mining District NPL site presently extends from the San Juan caldera, down the Animas and San Juan Rivers, through New Mexico, and into Lake Powell in Utah."[4]

Because granting any relief in Utah would conflict and interfere with EPA's exclusive

---

[3] In addition, those sites constituting the Bonita Peak Mining District have been named in the top 21 NPL listings "targeted for immediate, intense action."  *See* "Superfund Sites Targeted for Immediate, Intense Action" EPA (Dec. 8, 2017); https://www.epa.gov/superfund/superfund-sites-targeted-immediate-intense-action.  This designation makes it one of the top national priorities for cleanup and this litigation should not be allowed to interfere with the agency's ability to respond efficiently and effectively.

[4] EPA's Supp. Br. on Jurisdiction at 14, *State of New Mexico v. US EPA et al.*, No. 1:16-cv-00465-MCA-LF (N. N.M. Nov. 11, 2017), ECF No. 183.  The court can take judicial notice of these pleadings.  *See* fn. 2 *supra*.

jurisdiction over its on-going response action activities and cleanup remedies, Utah's claims for court-ordered abatement or any type of relief involving these alleged CERCLA "facilities" are prohibited by Section 113(h).  *See, e.g., Shea Homes Ltd. Partnership v. United States*, 397 F.Supp.2d 1194 (N.D.Cal. 2005) (claims for abatement of migrating landfill gas sought to improve a CERCLA cleanup and were barred by Section 113(h)); *Reynolds v. Lujan*, 785 F.Supp. 152 (D.N.M. 1992) (pleading seeking an order compelling defendant to engage in a "comprehensive cleanup" of a Superfund site would "alter the [EPA's] ongoing response activities," which "is exactly what § 113(h) prohibits").  As a result, other than cost recovery, all of Utah's claims are prohibited by Section 113(h) and should therefore be dismissed.

> **D.     Utah's State Law Claims conflict with CERCLA's restoration provisions and should be dismissed pursuant to the doctrine of conflict preemption.**

Utah's claims based on negligence/gross negligence, public nuisance, and trespass ("State Law Claims") should be dismissed because they conflict with the comprehensive natural resource restoration objectives established by CERCLA and are therefore preempted.  To determine whether a federal statute preempts a state law or statute, a court must determine whether Congress expressly or impliedly intended to preempt state law by enacting the federal statute.  *Emerson v. Kansas City Southern Ry. Co.,* 503 F.3d 1126, 1129 (10th Cir. 2007).  In the absence of express preemption, a court may find that a federal statute impliedly preempts state law in two ways.  First, if Congress intends that federal law should entirely occupy a particular field, state regulation in that field is preempted.  *California v. ARC America Corp.*, 490 U.S. 93, 100 (1989).  Second, even if Congress does not intend to occupy the field and wholly prevent state regulation, federal law will preempt state law to the extent the state law actually conflicts with the federal law.  *Id.*

The Tenth Circuit has found an actual conflict between state and federal law in cases "where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Choate v. Champion Home Builders Co.*, 222 F.3d 788, 792 (10th Cir. 2000).

In *New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223 (10th Cir. 2006), the Tenth Circuit recognized that CERCLA does not completely preempt all state law claims, but it does impact the availability of certain damages under those claims.  In *General Electric*, the Tenth Circuit initially advised that conflict preemption is an affirmative defense available to defendants facing CERCLA claims and state-based tort claims "notwithstanding the presence of the saving clauses" contained within CERCLA.  *Id.* at 1244.  The Tenth Circuit instructed trial courts to weigh CERCLA's preemption of state law claims by "ask[ing] whether that claim, or any portion thereof, stands as an obstacle to the accomplishment of congressional objectives as encompassed in CERCLA."  *Id.*  Courts should dismiss state law claims that may have an adverse impact upon CERCLA's "comprehensive mechanism to clean up hazardous waste sites under a restoration-based approach."  *Id.*

The *General Electric* court further explained why CERCLA typically preempts claims for monetary damages under state law torts:  "The **measure** and **use** of damages arising from the release of hazardous waste is restricted to accomplishing CERCLA's essential goals of restoration or replacement, while also allowing for damages due to interim loss of use."  *Id.* at 1245 (Court's emphasis).  Thus, "[S]ound public policy, as reflected in CERCLA . . . demands that environmental protection and preservation be the primary, if not the sole, objective of natural resource damage ["NRD"] valuation," and "[t]he ultimate purpose of any such remedy

should be to protect the public interest in a healthy functioning environment, and **not to provide a windfall to the public treasury**." *Id*. at 1247 (Court's emphasis) (internal quotations and citations omitted).

Accordingly, the Tenth Circuit held:

> CERCLA's comprehensive NRD scheme preempts any state remedy designed to achieve **something other than the restoration, replacement, or acquisition of the equivalent of a contaminated natural resource**. We reach this conclusion notwithstanding CERCLA's saving clauses because we do not believe Congress intended to undermine CERCLA's carefully crafted NRD scheme through these saving clauses. . . . The restrictions on the use of NRDs . . . represent Congress' considered judgment as to the best method of serving the public interest in addressing the cleanup of hazardous waste. We cannot endorse any state law suit that seeks to undermine that judgment.

*Id.* (citations omitted) (emphasis added).

The damage remedies Utah seeks with its State Law Claims go far beyond "the restoration, replacement, or acquisition of the equivalent of a contaminated natural resource." *Id*. Utah seeks to impose contrary or inconsistent requirements and hamper EPA's ability to effectively address the cleanup. *See U.S. v. City and County of Denver*, 100 F.3d 1509, 1514 (10th Cir. 1996) (finding conflict preemption where state law stood as an "obstacle to the objectives of CERCLA").

As a remedy for SGC's alleged negligence/gross negligence, Utah seeks unspecified and unrestricted money damages "in an amount to be proven at trial." Compl. ¶¶ 82. As a remedy for SGC's alleged public nuisance, Utah, without limitation, seeks unrestricted money damages for "lost economic activity, tax revenues, and stigmatic damages" in an amount "to be proven at trial." Compl. ¶¶ 92, 95. As a remedy for SGC's alleged trespass, Utah seeks unrestricted money damages allegedly caused by "injury to the State of Utah's property rights in various ways, including but not limited to the elimination of sources of tourism revenue and recreation, the

destruction of vegetation in areas surrounding the San Juan River and Lake Powell and property dependent on resources from those waterways . . . in an amount to be determined at trial." Compl. ¶¶ 104–105.  The unrestricted money damages Utah seeks with its various State Law Claims plainly conflict with the accomplishment of CERCLA's remedial scheme and therefore interfere with CERCLA's goals of replacement and restoration of a contaminated natural resource.

Allowing Utah's State Law Claims to go forward would frustrate and impair CERCLA's restoration provisions because, if such claims were successful, it would diminish the financial sums available for actual natural resource recovery.  Courts facing such a situation have concluded that a successful tort claim would ultimately harm the natural resource plan embodied in Section 107(f)(1) and therefore those tort claims are preempted.  *See, e.g., Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 772 (9th Cir. 1994) (finding that if state tort claims are allowed to proceed simultaneously with CERCLA claims, "the result would be to severely limit the amount of damages government trustees could recover on behalf of the public in future environmental disasters" and opining that "[g]iven the restorative purposes behind . . . CERCLA, it simply makes no sense"); *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1228 (D.C. Cir. 1996) (accepting the argument that it is inconsistent with CERCLA's comprehensive restoration regime to allow a party to recover sums in tort for natural resource injuries, in addition to Section 107(f)(1) damages, and then be able to apply these sums for purposes other than natural resource restoration).  Consistent with these authorities, this Court should dismiss Utah's State Law Claims because they are inconsistent with CERCLA's remedial scheme and restoration program and are therefore preempted.

**E.      Utah's State Law Claims are Preempted by the Clean Water Act.**

When it began operations in 1986, SGC held two Colorado Discharge Permit System

permits, CDPS Permit No. Co-0027529 and CDPS Permit No. CO-0036056, authorizing

discharges from the Sunnyside Mine, in accordance with numeric effluent limits and other

conditions.  Consent Decree at 2.  In addition, Colorado regulates SGC activities pursuant to a

Mined Land Reclamation Permit which also has various water quality related provisions.

Consent Decree at 4. The State of Colorado administers CDPS permits under authority delegated

to it by EPA pursuant to section 402(b) of the Federal Water Pollution Control Act, 33 U.S.C. §

1342(b) of the Clean Water Act, "CWA"; 40 Fed. Reg. 16713 (April 14, 1975) (EPA approval of

Colorado's program).

In its complaint, Utah alleges common law nuisance and trespass claims against SGC.

Compl. ¶¶ 85-107.  Utah also claims that discharges in Colorado, after traveling through

Colorado and New Mexico, are in fact a discharge into Utah state waters causing harm in Utah

that must be abated.  Utah alleges that those discharges subject SGC to civil penalties under

Utah's Water Quality Act and state hazardous waste laws.  Compl. ¶¶ 110-120.   The United

States Supreme Court has plainly held that the CWA preempts downstream state law claims

related to discharges originating in an upstream state.

In *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987) ("*Ouellette*"), Vermont

landowners brought Vermont common law nuisance claims against a New York mill that

discharged into a lake forming part of the border between New York and Vermont.  The central

issue was whether the CWA "pre-empts a common-law nuisance suit filed in a Vermont court

under Vermont law, when the source of the alleged injury is located in New York." *Id.* at

483.  In the course of deciding the issue, the Supreme Court analyzed the preemptive effect of

the CWA on state law claims.

> We hold that when a court considers a state-law claim concerning interstate water pollution that is subject to the CWA, the court must apply the law of the State in which the point source is located.

*Id.* at 487.  *Oullette* recognized several limitations on the role of downstream states affected by upstream interstate discharges and concluded that downstream regulation, or relief through litigation, was preempted:

> After examining the CWA as a whole, its purposes and its history, we are convinced that if affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious interference with the achievement of the 'full purposes and objectives of Congress.'

*Id.* at 493 (quoting *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 713 (1985)).

> The Court noted that, absent preemption, a downstream state could effectively override regulatory decisions made by an upstream state like Colorado.

> **If a New York source were liable for violations of Vermont law, that law could effectively override both the permit requirements and the policy choices made by the source State**.  The affected State's nuisance laws would subject the point source to the threat of legal and equitable penalties if the permit standards were less stringent than those imposed by the affected State….In suits such as this, an affected-state court also could require the source to cease operations by ordering immediate abatement.  **Critically, those liabilities would attach even though the source had complied fully with its state and federal permit obligations**.  The inevitable result of such suits would be that Vermont and other States could do indirectly what they could not do directly—regulate the conduct of out-of-state sources.

*Id.* at 495 (emphasis added).  The Court concluded its analysis by finding "the [CWA] pre-empts state law to the extent that the state law is applied to an out-of-state point source."  *Id.* at 500.  *See also Arkansas v. Oklahoma*, 503 U.S. 91, 100 (1992) ("[T]aken 'as a whole, its [the CWA] purposes and its history' pre-empted an action based on the

law of the affected State and that the only state law applicable to an interstate discharge is

'the law of the State in which the point source is located.'")

These principles were recently re-affirmed by the Fourth Circuit in the context of

the Deepwater Horizon disaster.  There, the Court of Appeals concluded that the CWA

preempted the claims of Louisiana and various parishes for state law pollution related

losses and state law penalties.  *In re Deepwater Horizon*, 745 F.3d 157 (4th Cir. 2014).

While the case involved a spill in coastal waters, the Court noted:

> Put in starkest terms, had the blowout occurred in Texas state waters and caused
> pollution in Louisiana, the Parishes' Louisiana law claims would be squarely
> foreclosed.  Federal preemption of interstate water pollution claims has been a
> feature of United States law for over a hundred years.

*Id.* at 166-167.   At all relevant times, SGC's conduct in Colorado has been subject to and

authorized by Colorado regulation, Colorado issued water discharge permits and the Mined Land

Reclamation Permit, and the court approved Consent Decree.  Under the authority referenced

above, Utah's state law claims regarding any alleged SGC discharges occurring in Colorado are

preempted.

### F.     Utah is not entitled to punitive damages and those claims must be dismissed.

Based on the State Law Claims, Utah seeks an award of punitive damages.  Compl. ¶¶

84, 97, 107, 124.  Utah law, however, does not allow for punitive damages in this action.

The Utah punitive damages statute provides:

> [P]unitive damages may be awarded only if compensatory or general damages are
> awarded and it is established by clear and convincing evidence that the acts or
> omissions of the tortfeasor are the result of willful and malicious or intentionally
> fraudulent conduct, or conduct that manifests a knowing and reckless indifference
> toward, and a disregard of, the rights of others.

Utah Code § 78B-8-201.  Thus, the statute requires very specific conduct to justify punitive

damages: "(1) willful and malicious or intentionally fraudulent conduct or (2) a knowing and

reckless indifference toward, and a disregard of, the rights of others." *Daniels v. Gamma W. Brachytherapy, LLC*, 221 P.3d 256, 269 (Utah 2009) (internal quotation omitted).

To establish that an action was knowing and reckless, the party must demonstrate the "tortfeasor knew of a substantial risk and proceeded to act or failed to act while consciously ignoring that risk." *Id.* Punitive damages may also be awarded where the defendant's conduct was "willful or malicious." Punitive damages are always "reserved for the most unusual and compelling circumstances. There must be some element of outrage normally present in the commissions of crimes or intentional torts." *Trugreen Companies, L.L.C. v. Scotts Lawn Serv.*, 508 F. Supp. 2d 937, 962 (D. Utah 2007) (internal quotations omitted). This element of outrage is necessary because "'[p]unitive damages constitute an extraordinary remedy' that 'should be applied with caution,'" and thus are "only appropriate in exceptional cases." *Farm Bureau Life Ins. Co. v. Am. Nat. Ins. Co.*, 408 Fed. App'x. 162, 166 (10th Cir. 2011) (unpublished) (quoting *First Sec. Bank of Utah, N.A. v. J.B.J. Feedyards, Inc.*, 653 P.2d 591, 598 (Utah 1982)) (internal citations omitted). Ultimately, Utah law requires evidence that the defendant's conduct "went *beyond* the level of scienter that supports a finding of liability—i.e., there must be some 'additional aggravating circumstances[.]'" *Id.* (quoting *Trugreen Companies, L.L.C.,* 508 F.Supp. 2d at 962) (emphasis in original).

Utah has failed to plead any aggravating circumstances that would allow for the imposition of punitive damages against SGC. Utah has failed to allege that SGC's actions create any element of outrage whatsoever. As alleged, SGC's actions were all taken in compliance with and at the direction of the State of Colorado and pursuant to Colorado issued permits and the court approved Consent Decree. The allegations themselves establish that SGC never acted with the requisite intent. *See, e.g., Boyle v. United Techs. Corp.*, 487 U.S. 500, 511-12 (1988)

(explaining that private parties following governmental orders should not be punished for complying with the orders); *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984) (declaring the axiom that legislatures wish to prevent "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," and for this reason it "necessarily follows that acts of [individuals] in accordance with official directions cannot be actionable").  Based on the allegations in the Complaint, the Court should dismiss Utah's request for punitive damages.

## IV.    CONCLUSION

SGC respectfully requests that the claims made against SGC be dismissed with prejudice for the following reasons:

(A)    This Court lacks personal jurisdiction over SGC.

(B)    The State of Colorado is a required party to this suit and Colorado cannot be joined as a party.

(C)    CERCLA Section 113(h) bars any interference with CERCLA response actions.

(D)    Utah's state law claims conflict with CERCLA's restoration provisions and must be dismissed based on the doctrine of conflict preemption.

(E)    Utah's state law claims are preempted by the CWA.

(F)    Utah is not entitled to punitive damages.


DATED this 15th day of December, 2017.

Respectfully submitted

CROWLEY FLECK PLLP

By /s/ Blake Klinkner
Blake Klinkner
237 Storey Boulevard, Suite 110

Cheyenne, WY 82009-1931
Telephone: (307) 426-4100
Facsimile: (307) 426-4099
*bklinkner@crowleyfleck.com*

Jeff Oven (*admitted pro hac vice*)
Chris Stoneback (*admitted pro hac vice*)
Pam Garman (*admitted pro hac vice*)
490 North 31st Street, Suite 500
PO Box 2529
Billings, MT 59103-2529
Telephone: (406)252-3441
Facsimile: (406) 252-5292
*joven@crowleyfleck.com*
*cstoneback@crowleyfleck.com*
*pgarman@crowleyfleck.com*

Neil Westesen (*admitted pro hac vice*)
1915 South 19th Street
PO Box 10969
Bozeman, MT 59719-0969
Telephone: (406) 556-1430
Facsimile: (406) 556-1433
*nwestesen@crowleyfleck.com*

*Attorneys for Defendant Sunnyside Gold
Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of December, 2017, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Sean D. Reyes, Utah Bar #7969
UTAH ATTORNEY GENERAL
Spencer E. Austin, Utah Bar #150
Chief Criminal Deputy Attorney General
Craig L. Barlow, Utah Bar #213
Assistant Attorney General
Utah Attorney General's Office
350 North State Street, Suite 230
Salt Lake City, UT 84114-2320
*spencerautin@agutah.gov*

Peter Hsiao (*admitted pro hac vice*)
Matthew L. Hofer (*admitted pro hac vice*)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017-3543
*phsiao@mofo.com*

*Attorneys for Plaintiff State of Utah*

John A. Adams, Utah Bar #0023
E. Blaine Rawson, Utah Bar #7289
RAY QUINNE & NEBEKER, PC
36 South State Street, Suite 1400
PO Box 45385
Salt Lake City, UT 84111

Andriy R. Pazuniak (*admitted pro hac vice*)
Terry D. Avchen (*admitted pro hac vice*)
Peter C. Sheridan (*admitted pro hac vice*)
GLASER WEIL FINK HOWARD
AVCHEN & SHAPIRO, LLP
10250 Constellation Blvd, 19th Floor
Los Angeles, CA 90067

*Attorneys for Defendant Environmental Restoration, LLC*

Craig D. Galli, Utah Bar #5072
Steven G. Jones, Utah Bar #15063
HOLLAND & HART, LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101

Jill H. Van Noord (*admitted pro hac vice*)
HOLLAND & HART, LLP
555 17th Street, Suite 3200
Denver, CO 80202

Brad Berge (*admitted pro hac vice*)
HOLLAND & HART, LLP
PO Box 2208
Santa Fe, NM 87504-2208

*Attorneys for Defendants Kinross Gold Corporation and Kinross Gold USA, Inc.*

Stephen J. Trayner #4928
Ryan P. Atkinson, Utah Bar #10673
STRONG & HANNI
102 South 200 East, Suite 800
Salt Lake City, UT 84111

Brian Molzahn
HALL & EVANS, LLC
1001 Seventeenth Street, Suite 300
Denver, CO 80202

*Attorneys for Harrison Western Corporation*

By /s/ Blake Klinkner
Blake Klinkner